**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| TANIYAH PILGRIM and<br>MESSIAH YOUNG,<br><br>     Plaintiffs,<br><br>vs.<br><br>CITY OF ATLANTA, GEORGIA;<br>KEISHA LANCE BOTTOMS, in her<br>individual and official capacity as the<br>Mayor of the City of Atlanta; LONNIE<br>HOOD, in his individual and<br>supervisory capacity; MARK<br>GARDNER, in his individual capacity;<br>IVORY STREETER, in his individual<br>capacity; ARMON JONES, in his<br>individual capacity; WILLIE T. SAULS,<br>JR., in his individual capacity;<br>ROLAND CLAUD, in his individual<br>capacity; CARLOS SMITH, in his<br>individual capacity; STEVEN<br>MCKESEY, in his individual capacity;<br>SHELDON DRINKARD, in his<br>individual capacity; and JOHN DOE<br>OFFICERS 1-10, in their respective<br>individual and/or supervisory<br>capacities,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION NO. _____<br>)<br>)    Jury Trial Demanded<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**<u>COMPLAINT FOR DAMAGES</u>**

**COME NOW** Plaintiffs Taniyah Pilgrim and Messiah Young (hereinafter "Plaintiffs"), by and through their undersigned counsel of record and hereby file their Complaint for Damages arising out of Defendants' unlawful use of excessive force against them on May 30, 2020, showing this Honorable Court as follows:

## INTRODUCTION

1.      Plaintiffs bring this civil action seeking damages pursuant to 42 U.S.C. § 1983 for Defendants' violations of Plaintiffs' federal rights as guaranteed by the First, Fourth, and Fourteenth Amendments of the United States Constitution and for violations of Georgia law.

2.      On May 25, 2020, George Floyd, an African American man, was killed in broad daylight in front of a convenience store in Minneapolis, Minnesota after a white police officer knelt on his neck for over nine (9) minutes while Mr. Floyd was handcuffed and repeatedly pleading, "I can't breathe."

3.      The killing of George Floyd caused a national outcry from citizens across the country who gathered to protest police brutality against African-Americans, which protests began taking place in major cities across the United States in the week following Mr. Floyd's death, including Atlanta.

4.      In response to the Atlanta protests of police brutality that occurred on May 29, 2020, during the late afternoon of May 30, 2020, Mayor Keisha Lance

Bottoms established a city-wide curfew for the entire territorial limits of the City of Atlanta which went into effect less than four hours later at 9:00 p.m. that same evening.

5.     The subject incident occurred at approximately 9:39 p.m. on May 30, 2020 while Plaintiffs, who did not participate in any of the protests and who were unaware of the curfew, were attempting to drive home.

## PARTIES AND JURISDICTION

6.     Plaintiff Messiah Young is a 23-year-old African-American male college student who is presently completing a degree at Morehouse College.

7.     Plaintiff Taniyah Pilgrim is a 21-year-old African-American female college student who is presently completing a degree at Spelman College.

8.     Plaintiffs reside in Fulton County, Georgia.

9.     The Individual Defendants are each residents of the State of Georgia, and at least one of them resides within the Northern District of Georgia.

10.    Upon service of the summons and complaint in a manner prescribed by law, Defendants shall be properly subject to the personal jurisdiction of the Court.

11.    The subject incident occurred in the area near International Blvd. and Centennial Olympic Park in Fulton County, Georgia, which is within the Northern District of Georgia, Atlanta Division. Venue is therefore proper in this court.

12.     Defendant City of Atlanta (the "City") is a political subdivision of the State of Georgia and exercises its police powers through the Atlanta Police Department ("APD"); the City may be served by and through its Mayor, the Honorable Keisha Lance Bottoms, at her office in Atlanta City Hall.

13.     Plaintiffs provided timely ante litem notice of their claims to the City on or about June 18, 2020, and through an amended notice on or about July 29, 2020.

14.     Plaintiffs will be requesting a waiver of service for each Defendant named herein.

15.     At all times material hereto, Defendant Keisha Lance Bottoms was and is presently the Mayor of the City of Atlanta, and was at all relevant times herein acting in her capacity as such. Defendant Bottoms is being sued in her individual and official capacities as Mayor of the City.

16.     At all times material hereto, Defendant Lonnie Hood was a law enforcement officer and police sergeant with supervisory authority employed by the City of Atlanta and was acting under color of state law within the scope of his duties as such. Defendant Hood is being sued in his individual capacity.

17.     At all times material hereto, Defendant Mark Gardner was a law enforcement officer employed by the City of Atlanta and was acting under color

of state law within the scope of his duties as such. Defendant Gardner is being sued in his individual capacity.

18.    At all times material hereto, Defendant Ivory Streeter was a law enforcement officer employed by the City of Atlanta and was acting under color of state law within the scope of his duties as such. Defendant Streeter is being sued in his individual capacity.

19.    At all times material hereto, Defendant Armon Jones was a law enforcement officer employed by the City of Atlanta and was acting under color of state law within the scope of his duties as such. Defendant Jones is being sued in his individual capacity.

20.    At all times material hereto, Defendant Willie Sauls, Jr. was a law enforcement officer employed by the City of Atlanta and was acting under color of state law within the scope of his duties as such. Defendant Sauls is being sued in his individual capacity.

21.    At all times material hereto, Defendant Roland Claud was a law enforcement officer employed by the City of Atlanta and was acting under color of state law within the scope of his duties as such. Defendant Claud is being sued in his individual capacity.

22.     At all times material hereto, Defendant Carlos Smith was a law enforcement officer employed by the City of Atlanta and was acting under color of state law within the scope of his duties as such. Defendant Snith is being sued in his individual capacity.

23.     At all times material hereto, Defendant Steven McKesey was a law enforcement officer employed by the City of Atlanta and was acting under color of state law within the scope of his duties as such. Defendant McKesey is being sued in his individual capacity.

24.     At all times material hereto, Defendant Sheldon Drinkard was a law enforcement officer employed by the City of Atlanta and was acting under color of state law within the scope of his duties as such. Defendant Drinkard is being sued in his individual capacity.

25.     At all times material hereto, Defendants John Doe Officers 1-10 were law enforcement officers employed by the City of Atlanta and were acting under color of state law within the scope of their duties as such, and are being sued in their respective individual capacities.

## FACTUAL ALLEGATIONS

26.     On May 29, 2020, "thousands of persons gathered in the City of Atlanta to honor the life of George Floyd, a Black American man killed by a law enforcement

officer in the City of Minneapolis, Minnesota, to demand justice for his killing, and to march in solidarity." City of Atlanta Executive Order 2020-92.

27.     Defendant Bottoms concluded that these large gatherings of citizens protesting police brutality and demanding justice for Mr. Floyd's killing gave rise to "an extreme likelihood of destruction of life or property within the entire territorial jurisdiction of the City of Atlanta." Executive Order 2020-92.

28.     At approximately 5:17 p.m. on May 30, 2020, Defendant Bottoms exercised the City's executive emergency powers by issuing Executive Order 2020-92 which declared an emergency and established a city-wide curfew for the entire territorial limits of the City of Atlanta, which curfew was scheduled to go into effect less than 4 hours later at 9:00 p.m. on May 30, 2020.

29.     In light of the newly-declared emergency and pursuant to the Executive Order, Defendant Bottoms ordered the Chief of Police to send APD officers, including but not limited to Defendants, to downtown Atlanta for the exclusive purpose of enforcing the Executive Order and the 9:00 p.m. curfew.

30.     Pursuant to Defendant Bottoms' Executive Order and in an effort to enforce the 9:00 p.m. curfew established therein, APD officers closed off several streets in the area around International Blvd. and Centennial Olympic Park where a protest had just taken place.

31.     After closing off the streets, APD officers attempted to funnel vehicle traffic away from the area by directing drivers to use specially-delineated, one-way lanes of travel which were otherwise not normally intended for vehicle traffic in non-emergency circumstances.

32.     Heavy vehicle traffic in these travel lanes quickly slowed to a crawl and oftentimes came to a complete stop due to gridlocked traffic in and around the area.

33.     At the time the curfew went into effect at 9:00 p.m., many residents of the City, including Plaintiffs, were still unaware that a curfew had been established by Executive Order.

34.     At approximately 9:39 p.m. on May 30, 2020, Plaintiff Messiah Young was driving home in the front driver's seat with Plaintiff Pilgrim in the front passenger's seat of the vehicle, unaware that a city-wide curfew had taken effect, and drove through the area around Centennial Olympic Park where APD officers had closed the streets and were detouring vehicle traffic around the street closures.

35.     At all material times herein, Plaintiff Young was lawfully operating Plaintiff Pilgrim's vehicle in an authorized lane of travel as directed by APD officers.

36.     Due to heavy vehicle traffic in and around the area, Plaintiff Young was frequently forced to stop the vehicle behind vehicles in front of him while waiting for traffic to clear.

37.     While the vehicle was stopped due to heavy traffic, Plaintiff Young observed an APD officer using force against a citizen on the side of the street, and while remaining seated inside his vehicle and waiting for traffic to clear, began recording the officer's actions, as he had a right to do under the First Amendment.

38.     At no point did Plaintiff Young or his vehicle impede the flow of traffic which was at a virtual standstill, did not obstruct or impede Defendant Hood or any other officer from performing his lawful duties, and did not violate any applicable law.

39.     While the vehicle Plaintiff Young was driving was stopped behind another vehicle waiting for pedestrians to cross the street in front of him, Defendant Lonnie Hood approached Plaintiff Young on the driver's side of the vehicle and ordered him to move the vehicle forward and get out of the area.

40.     Plaintiff Young could not move his vehicle forward due to pedestrians crossing the street in front of his vehicle and because the vehicle in front of him was stopped due to gridlocked traffic ahead.

41.     Defendants had knowledge that there existed heavy vehicular and pedestrian traffic in and around the area and that Plaintiffs "c[ouldn]'t go nowhere."

42.     Upon observing that there were no pedestrians in front of him and that the vehicle ahead of him had moved forward a few yards, Plaintiff Young complied

with Defendant Hood's commands and moved his vehicle forward a few yards to close the small gap between the vehicle in front of him, but due to heavy traffic, was again forced to stop.

43.     At the time Plaintiff Young moved his vehicle forward, Defendant Hood had not given any commands to Plaintiff Young other than to move his vehicle forward.

44.     By slowly moving his vehicle forward, Plaintiff Young did not cause or threaten physical injury to any officer or other person at the scene, and did not hinder or obstruct any officers from performing their lawful duties by doing so.

45.     When Plaintiffs' vehicle stopped due to traffic, Defendants Hood, Streeter, Gardner, Sauls, Claud, and Jones ran up to Plaintiffs' stopped vehicle and surrounded it on both sides, with Defendants Hood and Gardner at the front passenger's side door where Plaintiff Pilgrim was seated, and Defendants Streeter, Sauls, Claud, and Jones at the front driver's side door where Plaintiff Young was seated.

46.     With multiple APD officers surrounding both sides of the vehicle, Defendant Hood immediately began yelling at Plaintiff Pilgrim to open the door while aggressively pulling at the door handle, and Defendant Streeter aimed his gun

directly at Plaintiff Young while Defendant Sauls began violently beating on the front driver's side window with his ASP baton.

47.     BWC (Body Worn Camera) video footage depicts Plaintiff Pilgrim frantically opening the passenger's door as commanded by Defendant Hood and asking what was happening.

48.     When Plaintiff Pilgrim opened the passenger's door, Defendant Hood immediately ordered her to get out of the vehicle.

49.     Approximately 10 seconds after Defendant Hood first ordered Plaintiff Pilgrim to get out of the vehicle, and as Plaintiff Pilgrim was turning to get out of the car as ordered, without warning, Defendant Gardner suddenly shot his Taser at Plaintiff Pilgrim which deployed taser prongs and electrocuted Plaintiff Pilgrim in the passenger's seat.

50.     Plaintiff Pilgrim lost control of her body and began convulsing while screaming due to extreme pain and shock from being tased and electrocuted without warning, in response to which Plaintiff Young attempted to dislodge the taser prongs from Plaintiff Pilgrim's person.

51.     Five seconds after Defendant Gardner tased Plaintiff Pilgrim, and while Plaintiff Pilgrim was still physically incapacitated, Defendant Hood suddenly tased her a second time by deploying taser prongs which again electrocuted her.

52.     While Plaintiff Pilgrim was being tased in the passenger's seat, Defendant Claud used a window punch to shatter the front driver's side window where Plaintiff Young was seated.

53.     Defendant Ivory Streeter shot his Taser at Plaintiff Young through the broken driver's side window thereby deploying taser probes which electrocuted Plaintiff Young while he was seated in the driver's seat.

54.     Defendant Hood pulled Plaintiff Pilgrim out of the passenger's seat and slammed her to the ground where she was handcuffed.

55.     Defendant Hood pointed and shot his Taser at Plaintiff Young thereby electrocuting him a second time, and then reached across to the driver's seat and violently began pulling Plaintiff Young toward him on the passenger's side.

56.     While Defendant Hood was violently pulling Plaintiff Young toward the passenger's side door, multiple APD officers, including Defendant Armon Jones, violently began pulling Plaintiff Young in the opposite direction toward the driver's side door.

57.     While these officers were playing tug-of-war and pulling on Plaintiff Young's body from opposite sides of the vehicle, Defendant Carlos Smith walked

over from the passenger's side to the driver's side and without observing any gun, immediately yelled out to other officers that Plaintiff Young had a gun.

58.     In response to Defendant Smith's representation that Plaintiff Young had a gun, Defendant Armon Jones pulled his city-issued weapon and pointed it directly at Mr. Young while struggling to get him out of the vehicle.

59.     Defendant Armon Jones forcefully dragged Plaintiff Young out from the driver's seat by his left arm and then slammed him onto the paved street, following which Plaintiff Young was handcuffed and placed under arrest.

60.     Plaintiffs remained under arrest and were unlawfully detained for several hours by John Doe Officers 1-2 employed by APD.

61.     Defendants Hood, Streeter, Gardner, Sauls, Claud, and Jones were each in a position to stop the other's use of excessive force but did not intervene or question the force being used by other officers, and instead ganged up on Plaintiffs.

62.     Defendants McKesey, Smith, Drinkard, and John Doe Officers 1-10 were each standing in the immediate presence of the Defendants while they were using excessive force against Plaintiffs, and despite being in a position to intervene, chose to stand by and watch without making any effort to stop the obvious use of excessive force.

63.    On May 31, 2020, an APD officer swore out warrants charging Plaintiff Young with eluding police, among other criminal offenses, which charges were dismissed the following day.

64.    No criminal charges were ever filed against Plaintiff Pilgrim in connection with the subject incident.

65.    In a press conference on May 31, 2020, Mayor Bottoms readily acknowledged that "[t]here clearly was an excessive force" based on her review of the "very disturbing video" footage from the officers' BWCs, and after "extensive discussions" with former Chief of Police Erika Shields.

66.    On June 1, 2020, the Fulton County District Attorney's Office swore out criminal arrest warrants against Defendants based on the crimes they committed against Plaintiffs in connection with the subject incident.

67.    Defendant Ivory Streeter was charged with aggravated assault and pointing or aiming gun or pistol at another. The warrant for Streeter's aggravated assault charge states he "intentionally and without justification used a deadly weapon, a Taser, against Messiah Young, which, when used offensively against a person, is likely to or actually does result in serious bodily injury." His warrant for pointing a gun states that he "intentionally and without justification pointed or aimed, a hand gun, at Messiah Young, whether the gun was loaded or unloaded."

68.    Defendant Mark Gardner was charged with aggravated assault, the warrant for which states that he "intentionally and without justification used a deadly weapon, a Taser," against Plaintiff Pilgrim.

69.    Defendant Armon Jones was charged with aggravated battery for "caus[ing] bodily harm to another, Messiah Young, by depriving him of a member of his body, by rendering a member of his body useless, his left arm, when he dragged Messiah Young from a parked vehicle and slammed him into a paved street." Jones was also charged with pointing or aiming a gun at Plaintiff Young.

70.    Defendant Lonnie Hood was charged with three charges: two aggravated assault charges for using a Taser against both Young and Pilgrim, and a third simple battery charge which states he "intentionally and without justification made physical contact with Taniyah Pilgrim, of an insulting or provoking nature, by violently pulling Taniyah Pilgrim out of a parked vehicle and throwing Taniyah Pilgrim down onto the paved street."

71.    Defendant Willie Sauls was charged with aggravated assault for "point[ing] a deadly weapon, a Taser, at Taniyah Pilgrim" and also charged with criminal damage which states he "intentionally and without justification damaged the property of another person without her consent and the damage thereto is less than $500.00, by repeatedly striking and caused damage to the driver's front

window of a 2017 Black Mazda belonging to Taniyah Pilgrim, with an expandable asp baton."

72.     Defendant Roland Claud was charged with criminal damage for damaging Plaintiffs' vehicle "by breaking the windows, with a window punch."

73.     On June 1, 2020, Defendants Lonnie Hood, Mark Gardner, and Ivory Streeter were terminated from employment with the City of Atlanta based on their respective uses of excessive force by tasing Plaintiffs in violation of City of Atlanta Work Rule 4.2.50 (maltreatment or unnecessary force).

74.     On June 3, 2020, Defendant Armon Jones was terminated from employment with the City of Atlanta based on his violation of various Work Rules including Work Rule 4.2.50 (maltreatment or unnecessary force).

75.     Defendants Willie Sauls and Roland Claud were reprimanded for their unlawful seizure and use of force against Plaintiffs' vehicle in connection with the subject incident, and were not investigated to determine whether they failed to intervene.

76.     At no point has APD investigated, reprimanded, or disciplined any officer for failing to intervene in the excessive use of force against Plaintiffs.

77.     As a result of Defendants' conduct in connection with the subject incident, Plaintiff Young sustained serious damage to his vehicle and Plaintiffs

Young and Pilgrim incurred significant medical expenses and suffered serious

bodily injuries and significant pain and suffering, extreme shock, and emotional

distress and trauma, the effects of which presently remain and will likely require

future medical treatment and care.

### COUNT I
### Plaintiffs' Fourth and Fourteenth Amendment Unlawful Seizure Claims against Defendants Lonnie Hood, Mark Gardner, Ivory Streeter, Armon Jones, Willie Sauls, Jr., Roland Claud, and John Doe Officers 1-2.

78.   Plaintiffs hereby incorporate and reallege Paragraphs 1 through 77 of

the Complaint as if fully restated herein.

79.   Defendants violated Plaintiffs' clearly-established Fourth

Amendment rights by unlawfully seizing Plaintiffs' vehicle and their persons

without actual or arguable reasonable suspicion and/or probable cause that

Plaintiffs had committed any crime, including but not limited to:

  a.   Defendants Hood, Gardner, Streeter, and Jones unlawfully seizing Plaintiffs' vehicle and unlawfully seizing Plaintiffs' persons;

  b.   Defendants Sauls unlawfully seizing Plaintiffs' vehicle by using his ASP baton to strike the driver's side window in an effort to break it open;

  c.   Defendant Claud unlawfully seizing Plaintiffs' vehicle by using a window-breaking tool to break the driver's side window;

  d.   John Doe Officers 1 and 2 unlawfully seizing Plaintiff Pilgrim's person by detaining and/or arresting her after she was removed from the vehicle.

80.     Defendants Sauls and Claud also violated Plaintiff Pilgrim's clearly established Fourteenth Amendment rights by unlawfully depriving her of her property in a manner which shocks the conscience.

81.     Every reasonable officer would have known that Defendants' seizure of Plaintiffs' vehicle and/or their persons would violate Plaintiffs' clearly-established Fourth and Fourteenth Amendment rights.

82.     Defendants are not entitled to qualified immunity for their respective violations of clearly-established law.

83.     As a direct and proximate result of these Defendants' violations of clearly-established law, Plaintiffs suffered injuries and damages.

## COUNT II
### Plaintiffs' Fourth Amendment Excessive Force Claims against
### Defendants Lonnie Hood, Mark Gardner, Ivory Streeter, and Armon Jones

84.     Plaintiffs hereby incorporate and reallege Paragraphs 1 through 77 of the Complaint as if fully restated herein.

85.     Defendants Hood, Gardner, Streeter, and Jones violated Plaintiffs' clearly-established Fourth Amendment rights by using excessive force without actual or arguable reasonable suspicion or probable cause which every reasonable

officer would have known would violate Plaintiffs' rights, including but not limited to:

     a.  Defendant Gardner tasing Plaintiff Pilgrim while she was in the passenger's seat;

     b.  Defendant Hood tasing Plaintiff Pilgrim while she was in the passenger's seat;

     c.  Defendant Hood pulling Plaintiff Pilgrim out of the passenger's seat and slamming her onto the paved street;

     d.  Defendant Hood pulling Plaintiff Young from the driver's seat to the passenger's side;

     e.  Defendant Hood tasing and physically pulling Plaintiff Young toward the passenger's side door;

     f.  Defendant Streeter tasing Plaintiff Young through the broken driver's side window;

     g.  Defendant Armon Jones pulling Plaintiff Young toward the driver's side door; and

     h.  Defendant Armon Jones dragging Plaintiff Young out of his vehicle and slamming him onto the paved street.

86. There existed no actual or arguable reasonable suspicion or probable cause to believe that Plaintiffs had committed any crime, much less a serious crime, and Plaintiffs posed no threat whatsoever at the time Defendants used unjustified, gratuitous force.

87. Every reasonable officer would have known that the force used by Defendants was objectively unreasonable and grossly disproportionate to any law

enforcement need and would violate Plaintiffs' clearly established Fourth Amendment rights.

88.    Defendants are not entitled to qualified immunity for their use of excessive force in violation of clearly-established law.

89.    Defendants were each in a position to stop the other officers' use of excessive force but failed to do so.

90.    Defendants are not entitled to qualified immunity and are liable for their respective failures to intervene in the other officers' use of excessive force against Plaintiffs in violation of clearly-established law.

91.    As a direct and proximate result of these Defendants' violations of clearly-established law, Plaintiffs suffered injuries and damages.

## COUNT III
### Plaintiffs' Fourth Amendment Claims for Failure to Intervene against Defendants Carlos Smith, Steven McKesey, Sheldon Drinkard, Willie Sauls, Jr., Roland Claud, and John Doe Officers 3-10

92.    Plaintiffs hereby incorporate and reallege Paragraphs 1 through 77 of the Complaint as if fully restated herein.

93.    At all relevant times herein, it was clearly-established in the Eleventh Circuit that law enforcement officers had an affirmative duty to intervene to stop the use of excessive force if in a position to do so.

94.    Defendants Smith, McKesey, Drinkard, Sauls, Claud, and John Doe Officers 3-10 were each in a position to intervene to stop the blatant use of excessive force against Plaintiffs.

95.    Not a single APD officer, including those with supervisory authority, made any effort to stop the use of excessive force against Plaintiffs on May 30, 2020.

96.    Defendants are not entitled to qualified immunity and are liable for their respective failures to intervene in the other officers' use of excessive force against Plaintiffs in violation of clearly-established law.

97.    As a direct and proximate result of these Defendants' violations of clearly-established law, Plaintiffs suffered injuries and damages.

## COUNT IV
## First Amendment Retaliation Claims against Defendant Lonnie Hood

98.    Plaintiffs hereby incorporate and reallege Paragraphs 1 through 77 of the Complaint as if fully restated herein.

99.    Plaintiff Young's exercise of his right to free speech by recording an officer's use of force against a citizen was not in any manner threatening or inciting violence, did not obstruct or impede Defendant Hood or any other officer from performing his/her lawful duties, and did not violate any applicable law.

21

100.   In retaliation against Plaintiff Young's exercise of his First Amendment right to free speech, Defendant Hood initiated the unlawful and malicious seizure of the vehicle he was driving and Plaintiffs' persons without actual or arguable reasonable suspicion or probable cause.

101.   At all material times herein, Defendant Hood intended to punish Plaintiff Young for his protected speech.

102.   Defendant Hood's retaliatory motive was the exclusive and/or substantial motivating factor behind Plaintiffs' arrests and seizures.

103.   Based on clearly-established law, every reasonable officer would have known that Defendant Hood's conduct would violate the First Amendment.

104.   Defendant Hood is not entitled to qualified immunity and is liable for his violation of Plaintiff Young's clearly-established First Amendment rights.

## COUNT V
### § 1983 Supervisory Claims against Defendant Lonnie Hood

105.   Plaintiffs hereby incorporate and reallege Paragraphs 1 through 77 of the Complaint as if fully restated herein.

106.   At all material times herein, Defendant Hood was a Sergeant in the Atlanta Police Department with supervisory authority over the other individual Defendant Officers.

107.    Defendant Hood directly participated in violating Plaintiffs' clearly-established Fourth Amendment rights by unlawfully seizing Plaintiffs' vehicle and their persons, and by using excessive force against Plaintiffs.

108.    Defendant Hood directly participated in violating Plaintiff Young's clearly-established First Amendment rights by unlawfully retaliating against protected speech.

109.    At all material times herein, Defendant Hood was in a position to immediately stop his subordinates from using excessive force against Plaintiffs, but made no effort to intervene.

110.    Defendant Hood is individually liable under § 1983 in his supervisory capacity for his direct participation in the violation of clearly-established law.

111.    As a direct and proximate result of Defendant Hood's unconstitutional conduct in his supervisory capacity, Plaintiffs suffered injuries and damages for which Defendant Hood is liable.

## COUNT VI
## § 1983 Claims against Mayor Keisha Lance Bottoms and the City of Atlanta based on Executive Order 2020-92

112.    Plaintiffs hereby incorporate and reallege Paragraphs 1 through 77 of the Complaint as if fully restated herein.

113.   At all material times herein, Defendant Bottoms was the final policymaker for the City of Atlanta with final decision-making authority with regard to the City's exercise of its emergency powers, including but not limited to establishing and enforcing the 9:00 p.m. curfew on May 30, 2020.

114.   Once filed with the Atlanta Municipal Court clerk, Executive Order 2020-92 had the effect and force of law within the territorial limits of the City of Atlanta.

115.   Executive Order 2020-92 was unconstitutionally vague and failed to provide fair notice to APD officers or citizens regarding the scope of the curfew and its prohibitions, including but not limited to the particular locations where the curfew applied and whether the curfew prohibited citizens from traveling through the City in a vehicle. *Compare with* Executive Order 2020-94 ("During the time any curfew declared in accordance herewith, persons shall refrain from remining on the streets and sidewalks within the territorial jurisdiction of the City of Atlanta. This shall not prohibit persons from traveling through the City of Atlanta via motor vehicle.").

116.   Executive Order 2020-92 unconstitutionally infringed on Plaintiffs' right to free speech and to freely travel within the city/state.

117. The curfew imposed by Executive Order 2020-92 was unconstitutionally overbroad and necessarily applied to each and every citizen present in the territorial limits of the City of Atlanta, regardless of whether they were part of a large gathering of people, and regardless of the likelihood that any particular citizen would incite violence or destroy property.

118. Executive Order 2020-92 expressly authorized APD officers to "do <u>any and all acts</u> necessary <u>and incidental</u> to the preservation of life, limb and property of the citizenry of the city" without exception and without regard for the constitutional rights of lawful citizens whom Defendant Bottoms had knowledge APD officers would encounter while enforcing the curfew in downtown Atlanta on May 30, 2020.

119. Thus, Executive Order 2020-92 gave APD officers free rein to unlawfully seize and authorized unlawful seizures and the use excessive force against citizens who were committing no crime on May 30, 2020, so long as doing so was "incidental" to efforts to enforce an unconstitutionally overbroad, vaguely-defined curfew.

120. Defendant Bottoms issued Executive Order 2020-92 in her capacity as final policymaker for the City of Atlanta.

121. Executive Order 2020-92 constitutes the official policy of the City.

122.    At all material times herein, the individual Defendants were each acting pursuant to the City's unconstitutional policy established by Defendant Bottoms' unconstitutionally overbroad, vague, and unenforceable Executive Order 2020-92.

123.    The City's unconstitutional official policy was the moving force behind and caused Plaintiffs' injuries and damages, for which Defendant Bottoms and the City are liable.

<u>**COUNT VII**</u>
<u>**§ 1983 Excessive Force Claims against**</u>
<u>**Defendant City of Atlanta**</u>

124.    Plaintiffs hereby incorporate and reallege Paragraphs 1 through 77 of the Complaint as if fully restated herein.

125.    Over the course of 20+ years, APD officers have routinely violated the Fourth Amendment by using excessive force against suspects with impunity, without provocation or justification, and without recourse, which customary pattern and practice was widespread and persistent throughout the police department.

126.    At all relevant times herein, the Chief of Police was the final policymaker for the City of Atlanta with final decision-making authority with regard to training and supervision of APD officers, establishing and implementing the written policies and procedures for the Atlanta Police Department ("APD"), and managing, directing, and controlling the operations, disciplinary process, and

administration of the department (references made to "APD" are intended to include the acting Chief of Police and the City).

127.   Richard Pennington was the acting Chief of Police for the City of Atlanta from 2002 to July 2010; George Turner was the acting Chief of Police from July 2010 through 2016; Erika Shields was the acting Chief of Police for the City of Atlanta from the beginning of 2017 until she resigned following the subject incident and the subsequent police shooting of Rayshard Brooks in June 2020, and was succeeded by Rodney N. Bryant who is presently serving as Chief of Police.

128.   Despite the widespread and routine use of excessive force, APD consistently failed to conduct meaningful investigations into allegations of incidents wherein APD officers used excessive force against suspects without provocation or justification.

129.   For example, in circumstances where video or audio evidence is not available to confirm or deny allegations that an officer used gratuitous, excessive force against a citizen, and despite the availability of a Computer Voice Stress Analysis ("CVSA") which is intended to be used in such circumstances where video/audio corroboration is lacking, APD's routine and customary practice has been to flatly disbelieve the allegation of excessive force without conducting a CVSA

or further inquiry, and to close the investigation citing insufficient evidence to confirm or deny the allegations made against the officer.

130. By way of example only, APD failed to conduct meaningful investigations of the following complaints wherein multiple officers were alleged to have used gratuitous, excessive force without justification:

a. On May 7, 2003, an uninterested bystander observed Defendant Gardner strike a handcuffed arrestee (David Childs) in the face with his knee and/or his gun while the arrestee was seated inside the Zone 3 precinct where surveillance videos were installed (the "Childs incident"), and informed APD of the same; despite the bystander's willingness to submit to a lie detector test to confirm his veracity, APD did not perform a lie detector test, and did not review the available surveillance video footage which would have confirmed or denied the allegation against Gardner; APD had knowledge that the head wounds Childs sustained during his arrest suddenly re-opened and began bleeding again while he was handcuffed at the precinct, but did not make any inquiry as to how the arrestee was re-injured at the precinct. APD opened and closed its investigation without confirming or denying whether the allegation that Gardner used excessive force at the precinct was true.

b. On July 1, 2006, an arrestee (Raymond Clay) informed APD that Defendant Mark Gardner struck him in the head with a two-way radio and kicked him while he was not resisting. APD opened and closed its investigation without confirming or denying whether the allegation that Gardner used excessive force was true.

c. On November 10, 2006, Jermichael Lockette informed APD that 2 APD officers - Defendant Streeter and/or Val Lester - used excessive force by suddenly punching him in the face and ripping out four dreadlocks from his head during an investigatory stop (the "Lockette incident").

1. Although both officers denied striking Lockette and claimed that they were unaware how he had sustained his confirmed injuries, APD administered a Computer Voice Stress Analysis ("CVSA") to both officers on March 16, 2007 which indicated deception when the officers denied using force against Lockette.

2. Based on the officers' deception, on or about May 21, 2007, APD concluded that the allegations of excessive force were SUSTAINED and issued oral reprimands to both officers.

3. On November 4, 2008, APD administered a CVSA to Lockette, which confirmed that no deception was indicated with regard to his allegations regarding the officers' use of force.

4. On December 24, 2008, APD prepared a new Investigation Disposition Form for the Lockette incident which, without explanation, now concluded that Streeter and Lester used reasonable force and recommended that the allegation that the officers punched Lockette in the face and pulled his dreadlocks out from his head be rescinded and changed to "NOT SUSTAINED."

5. Without offering any explanation, on or about June 15, 2009, APD adopted the recommendation and formally rescinded its prior finding that Streeter and Lester used excessive force by punching Lockette in the face and pulling his dreadlocks out from his head, and changed the disposition in both officers' disciplinary files to "NOT SUSTAINED."

6. At no point was either officer investigated, reprimanded, or disciplined for failing to intervene in the other officer's sustained use of excessive force in connection with the Lockette incident.

d. Karla Weems informed APD that on June 28, 2011, 4 APD officers from the Fugitive Unit broke through the front door of her home, handcuffed all occupants, and searched her home without a warrant. One of the handcuffed occupants, Mike Gibbs, informed APD that an

officer dragged him outside and threw him to the ground, face-first, after he was handcuffed and not resisting. Another occupant, Rontavious Loyal, informed APD that another officer kicked him and threw him to the ground outside.  The officers released all occupants after determining that the subject of their search was not present.  APD did not subject any of the officers who were present to CVSAs and instead closed its investigation without confirming or denying whether the allegation of excessive force was true.

e. Ezoeke Parks informed APD that on August 23, 2011, 2 APD Officers - Jose Vidal and Norattam Holden - beat her and her daughter, informing APD that: (i) Officer Vidal kicked her in her stomach, dragged and pulled her by her hair, and kneed her in her back during her arrest; and (ii) that Officer Holden grabbed her 14-year old daughter by her neck and kneed her in her stomach. The ACRB concluded that there was sufficient evidence to sustain the citizen's allegations of excessive force against both officers and recommended to APD that the officers be suspended and undergo psychological evaluation. APD rejected the ACRB's recommendation, and instead concluded that there was insufficient evidence to sustain the allegations of excessive force against either officer without subjecting anyone to a CVSA. More specifically, APD explicitly concluded that pulling the citizen's hair was a reasonable "method to ensure that she was handcuffed." APD did not investigate or discipline either officer for failing to intervene in the other's use of excessive force.

f. Bailey Cato informed APD that on September 14, 2014, 2 APD officers - Michael Soprano and Matthew Johns - pepper-sprayed him and repeatedly punched him in the face and beat him without provocation. APD and the Chief rejected the ACRB's finding that the allegation that these 2 APD officers used excessive force and rejected ACRB's recommendation that the officers be suspended and receive additional training, and did not impose any discipline on the officers for their use of excessive force. Moreover, APD did not investigate or discipline either officer for failing to intervene in the other's use of excessive force.

g. Richard Williams informed APD that on March 31, 2015, after several APD officers in the Fugitive Unit stormed into his motel room to arrest

him, an unidentified APD officer struck him in the head with a silver revolver while he was not resisting arrest. Despite confirming that the arrestee sustained a gaping two-inch headwound during his arrest which required treatment at the hospital, none of the __ officers present during the arrest could explain how Williams sustained said injury and provided conflicting accounts of the events that occurred during the arrest. APD did not subject any officers to CVSAs and instead closed its investigation without confirming or denying whether the allegation of excessive force was true.

131.   At all material times herein, the Chief of Police had knowledge of the numerous allegations of excessive force being improperly investigated by APD supervisors and/or the Office of Professional Standards, and had knowledge of the consistent absence of meaningful investigation involved therewith.

132.   The Chief of Police took no action to remedy the consistent and widespread lack of meaningful investigation into serious allegations that APD officers used gratuitous, excessive force against arrestees.

133.   To the contrary, as a matter of widespread and persistent pattern and practice, and without conducting a meaningful investigation, the Chief of Police routinely rejected the Atlanta Citizen Review Board's investigatory findings and recommendations that discipline be imposed against APD officers for using excessive force. *See* Complaint filed 10/10/18 in *Hall v. City of Atlanta,* Case No. 1:18-cv-04710-CAP (Doc. 1).

134.     In connection with the subject incident, Defendants were each acting pursuant to the City's official policy, custom, and/or practice of using gratuitous excessive force without recourse, which was the moving force behind their brazen use of gratuitous, excessive force against Plaintiffs.

135.     The City's widespread and persistent pattern and practice of failing to conduct meaningful investigations into numerous serious allegations of excessive force, and the lack of officer accountability directly associated therewith, was so widespread and persistent that it amounts to a municipal policy of deliberate indifference and was the moving force behind Defendants' use of excessive force against Plaintiffs.

136.     As a direct and proximate result of the City's unconstitutional conduct, Plaintiffs suffered injuries and damages for which the City is liable under § 1983.

## COUNT VIII
### § 1983 Claims against Defendant City of Atlanta for
### Failure to Train and/or Supervise APD officers

137.     Plaintiffs hereby incorporate and reallege Paragraphs 1 through 77 of the Complaint as if fully restated herein.

138.     At all material times herein, it was clearly-established in the Eleventh Circuit that police officers have an affirmative duty under the Fourth Amendment to intervene to stop the use of excessive force if in a position to do so.

139.   In addition to the above-referenced prior incidents, APD consistently received numerous other complaints of incidents wherein multiple APD officers failed to intervene and ganged up on a citizen to use gratuitous, unnecessary and excessive force without any reasonable justification whatsoever.

140.   At all material times herein, the City and/or its Chief of Police had knowledge that APD officers were violating the rights of citizens with whom they come into contact by routinely ganging up instead of intervening when in the immediate presence of another officer using excessive force.

141.   The City and/or its Chief of Police had knowledge of a substantial likelihood that APD officers would continue violating citizens' rights in this manner absent supervision and training regarding the duty to intervene.

142.   For example, the City had knowledge of the following incidents but failed to investigate any APD officer to determine whether he/she violated the Fourth Amendment by failing to intervene:

    a.  The City had knowledge of a complaint alleging that on September 29, 2002, an APD officer used excessive force by physically pulling a compliant, non-resisting driver out of his vehicle and slamming him to the ground during a routine traffic stop, and had knowledge that despite two other APD officers being in a position to stop the use of excessive force, these officers did not intervene and instead jumped in by repeatedly kicking the driver in his head and arms once he was on the ground.

b.  The City had knowledge of a complaint alleging that on January 13, 2009, multiple APD officers were present and in a position to stop Sgt. Kelly Lambert and other officers from beating a non-resisting arrestee with batons while being held to the ground, pepper-spraying him, and repeatedly tasing him, while none of the other officers who were present made any effort to intervene.

c.  The City had knowledge of a complaint alleging that on June 28, 2011, multiple APD officers in the Fugitive Unit, including Defendant Gardner, were present when a non-resisting bystander was kicked and thrown to the ground during execution of a warrantless search of a residence, and had knowledge that none of the officers intervened.

d.  The City had knowledge of a complaint alleging that on August 23, 2011, at least 4 APD officers were present and in a position to stop other officers from beating, kicking, and stomping a non-resisting arrestee on the ground, and had knowledge that none of the officers who were present intervened.

e.  The City had knowledge of a complaint alleging that on April 8, 2013, approximately 10-15 APD officers were present and in a position to stop an APD officer from pushing an innocent bystander down a hill, a second officer from placing the bystander in a chokehold when he got to the bottom of the hill and slamming him to the ground, and a third officer from pepper-spraying him in the face, and had knowledge that none of the officers who were present intervened.  Hill v. City of Atlanta, 1:15-CV-01421-AT, 2016 WL 11586947, at *1 (N.D. Ga. Mar. 29, 2016).

f.  The City had knowledge of a complaint alleging that on May 21, 2014, at least 4 APD officers were present and in a position to stop other officers from kicking and punching a handcuffed arrestee (Danyell Thomas) in the face while he was not resisting on the ground, and to stop another officer from thereafter pepper-spraying said arrestee in the face while yet another officer was holding the arrestee's head up, and had knowledge that none of the officers who were present intervened.

g. The City had knowledge of a complaint alleging that on March 31, 2015, at least 5 APD officers were present and in a position to stop another officer from pistol-whipping or otherwise striking the arrestee in the head with sufficient force to leave a gaping two-inch head wound, and had knowledge that none of the officers who were present intervened The arrestee alleged that he was pistol-whipped in the head with a silver revolver. Defendant Gardner was the arresting officer and was in possession of his personal silver revolver. Despite the presence of at least 5 APD officers in the room when the suspect was arrested and received the gaping wound to his head, none of them provided APD with an explanation as to how the suspect received the injury. APD exonerated Gardner for any alleged excessive force, and did not investigate any of the other officers for their failure to intervene.

h. Vincenzo Palazzola informed APD that on July 29, 2015, 3 APD officers - John Harwell, Jonathan Jaake, and Theodore Travis - struck him from behind and took him to the ground without justification, following which the officers repeatedly punched him in his face and chest with a closed fist and beat him with an ASP baton while one was on the ground, and then punched him in the face twice with a closed fist while he was handcuffed in the ambulance. APD did not investigate, discipline, or provide additional training to any officer based on their failure to intervene in any other officer's use of excessive force.

143.   Despite the presence of multiple officers when excessive force was used, not a single APD officer made any effort whatsoever to intervene in any of the above-referenced incidents.

144.   As a matter of routine and customary practice, APD officers never question or intervene in a fellow officer's decision to use force at the scene and instead, routinely gang up with other officers to use excessive force without

questioning whether doing so was justified or lawful, and despite the absence of any objectively reasonable justification whatsoever.

145.   Despite knowledge of the substantial risk of harm that could result from an officer failing to intervene, APD made a deliberate choice not to take any action to investigate, discipline, supervise, or train APD officers regarding their constitutional duty to intervene.

146.   In connection with the subject incident, Defendants were each acting pursuant to APD's widespread and persistent pattern and practice of not questioning or intervening in a fellow officer's use of excessive force, and thus did not intervene to stop the use of excessive force against Plaintiffs.

147.   At all material times herein, APD's written policies and procedures were promulgated and implemented by the acting Chief of Police, and did not make any reference to an officer's constitutional duty to intervene.

148.   APD's use of force policy did not reference or otherwise address the duty to intervene until the new Interim Chief supplemented said policy in July 2020 to finally instruct APD officers to intervene in another officer's use of excessive force as constitutionally required.

149.    Prior to July 2020, the City provided no training or instruction to APD officers regarding their constitutional duty to intervene in the use of excessive force when in a position to do so.

150.    Based on presently-known information and reasonable belief, in connection with any investigation involving more than one officer wherein APD sustained an allegation of excessive force in the last 20+ years, including but not limited to the above-referenced incidents, APD made no effort to investigate whether the other involved officer(s) were in a position to but failed to intervene in violation of the Fourth Amendment, and did not reprimand, discipline, train, or supervise any such officer(s) for failing to intervene.

151.    Despite the July 2020 inclusion of the duty to intervene into APD's official use of force policy, given the widespread, permanent, and persistent nature of the City's unconstitutional pattern and practice of flatly ignoring the duty to intervene over a 20+ year period, the City's unconstitutional practice nevertheless continues today.

152.    For example, following the subject incident's occurrence, although APD swiftly disciplined and terminated the officers whom it properly concluded had used physical excessive force against Plaintiffs, APD never investigated or addressed

these officers' respective failures to intervene in the other uses of excessive force against Plaintiffs.

153.   Moreover, APD has yet to investigate, discipline, reprimand, or provide additional training to any of the multiple APD officers who stood by and watched as fellow officers used gratuitous, excessive force against Plaintiffs' persons in their immediate presence, and who clearly made no effort to intervene despite being in a position to, including but not limited to Defendants Smith, McKesey, Drinkard, Sauls, Claud, and the other presently-unidentified John Doe Officers.

154.   The City's widespread and persistent pattern and practice of failing to investigate, reprimand, discipline, train, and/or supervise APD officers regarding their constitutional duty to intervene amounts to a municipal policy of deliberate indifference which was the moving force behind Defendants' use of excessive force against Plaintiffs.

**COUNT IX**
**State Law Claims for Assault and Battery against**
**Defendants Hood, Gardner, Streeter, Jones, Sauls, and Claud**

155.   Plaintiffs hereby incorporate and reallege Paragraphs 1 through 77 of the Complaint as if fully restated herein.

156.   Defendants used a deadly weapon to commit a violent, serious bodily injury on Plaintiffs without justification, aimed a deadly weapon at Plaintiffs and

took other actions which placed them in reasonable apprehension of immediately receiving a violent injury, which constitutes an assault and/or battery under Georgia law.

157.   Plaintiffs suffered damages as a direct and proximate result thereof.

158.   Defendants acted with intent and with actual malice to injure, and are thus not entitled to official immunity and are liable for assault and/or battery.

## COUNT X
## State Law Claims for Trespass to Property against Defendants Sauls and Claud

159.   Plaintiffs hereby incorporate and reallege Paragraphs 1 through 77 of the Complaint as if fully restated herein.

160.   Defendants Sauls and Claud unlawfully abused and damaged Plaintiff Pilgrim's vehicle without justification which constitutes an intentional trespass under Georgia law.

161.   Plaintiff Pilgrim suffered significant damage to his vehicle as a result thereof.

162.   Defendants acted with intent and with actual malice to injure, and are thus not entitled to official immunity and are liable for trespass.

## COUNT XI
## State Law Claims for False Imprisonment and/or False Arrest against Defendants Hood, Gardner, Streeter, Jones, Sauls, Claud, and John Does 1-2

163.    Plaintiffs hereby incorporate and reallege Paragraphs 1 through 77 of the Complaint as if fully restated herein.

164.    Defendants Hood, Gardner, Streeter, Jones, Sauls, Claud, and John Doe Officers 1-2 unlawfully deprived Plaintiffs of their liberty by unlawfully detaining and/or arresting Plaintiffs' persons without justification which constitutes false imprisonment under Georgia law.

165.    Plaintiffs suffered damages as a direct and proximate result thereof.

166.    Defendants acted with intent and with actual malice to injure, and are thus not entitled to official immunity and are liable for false imprisonment.

### COUNT XII
### State Law Claims for Willful Misrepresentation of Material Fact and Deceit against Defendant Carlos Smith

167.    Plaintiffs hereby incorporate and reallege Paragraphs 1 through 77 of the Complaint as if fully restated herein.

168.    Defendant Smith willfully misrepresented a material fact by repeatedly yelling out to other officers that Plaintiffs had a gun while officers were actively assaulting Plaintiff Young while he was seated in the driver's seat.

169.   Defendant Smith recklessly and affirmatively represented to other officers that Plaintiffs had a gun with the intent to deceive.

170.   Defendant Smith had no reasonable basis to believe, much less had knowledge that Plaintiffs had a gun.

171.   In fact, Plaintiffs did not have a gun.

172.   Defendant Smith misrepresented this material fact to induce the other officers to use more aggressive and/or deadly force against Plaintiffs.

173.   Relying on Defendant Smith's misrepresentation regarding the presence of a gun, Defendant Jones pulled out his gun and aimed it directly at Plaintiff Young, thereby committing an assault by placing him in imminent fear of receiving a violent injury or death.

174.   Relying on Defendant Smith's misrepresentation regarding the presence of a gun, Defendant Jones violently dragged Plaintiff Young out of his vehicle and slammed him to the ground.

175.   According to his incident report, Defendant Gardner states that he tased Plaintiff Pilgrim relying on Defendant Smith's misrepresentation regarding the presence of a gun.

176.     Defendant Smith's willful and/or reckless misrepresentation of material fact regarding the presence of a gun constitutes an intentional tort under Georgia law.

177.     Plaintiffs suffered damages as a direct and proximate result thereof.

178.     Defendant Smith acted with intent and with actual malice to injure, and are thus not entitled to official immunity and liable for his misrepresentation of material fact.

## COUNT XIII
## Punitive Damages against the individual Defendants

179.     Plaintiffs hereby incorporate and reallege Paragraphs 1 through 77 of the Complaint as if fully restated herein.

180.     Defendants' conduct as described herein evidences willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care which is sufficient to establish that Defendants acted with conscious indifference to the consequences of their actions.

181.     At all material times herein, Defendants acted with malice and/or reckless indifference to Plaintiffs' federal rights and/or with a specific intent to cause harm.

182.    Plaintiffs are entitled to an award of punitive damages, without limitation or cap, under state and federal law.

## COUNT XIV
### Attorney's Fees

183.    Plaintiffs hereby incorporate and reallege Paragraphs 1 through 77 of the Complaint as if fully restated herein.

184.    Plaintiffs are entitled to an award of attorney's fees under § 1988 and Georgia law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that they have a trial before a jury on all issues and judgment against Defendants as follows:

(a)    That Plaintiffs recover general, compensatory, and punitive damages based on Defendants' violations of state and federal law;

(b)    That Plaintiffs recover reasonable attorney's fees and expenses of litigation under § 1988 and state law;

(c)    That all issues be tried before a jury; and

(d)    For such other and further relief as the Court deems just and proper.

This 17th day of June, 2021.

Respectfully submitted,

/s/ L. Chris Stewart

L. Chris Stewart, Esq.
Georgia Bar No. 142289
cstewart@smstrial.com

**STEWART MILLER SIMMONS**
55 Ivan Allen Jr Blvd
Suite 700
Atlanta, Georgia 30308
404-328-7461
470-344-6722 (fax)

/s/ *Harold W. Spence*
Harold W. Spence
Georgia Bar No. 671150
hspence@davisbozemanlaw.com
Mawuli M. Davis, Esq.
Georgia Bar No. 212029
mdavis@davisbozemanlaw.com

**DAVIS BOZEMAN LAW FIRM, P.C.**
4153 – C Flat Shoals Parkway
Suite 332
Decatur, Georgia 30034
404-244-2004
404-244-2020 (fax)