# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| TANIYAH PILGRIM AND MESSIAH YOUNG, <br><br>     Plaintiffs, <br><br> v. <br><br> CITY OF ATLANTA, GEORGIA; KEISHA LANCE BOTTOMS, in her individual and official capacity as the Mayor of the City of Atlanta; LONNIE HOOD, in his individual and supervisory capacity; MARK GARDNER, in his individual capacity; IVORY STREETER, in his individual capacity; ARMON JONES, in his individual capacity; WILLIE T. SAULS, JR., in his individual capacity; ROLAND CLAUD, in his individual capacity, CARLOS SMITH, in his individual capacity; STEVEN MCKESEY, in his individual capacity; SHELDON DRINKARD, in his individual capacity; and JOHN DOE OFFICERS 1-10, in their respective individual and/or supervisory capacities, <br><br>     Defendants. | CIVIL ACTION <br> FILE NO. 1:21-cv-02472-TWT |

## BRIEF IN SUPPORT OF DEFENDANTS CITY OF ATLANTA, GEORGIA AND KEISHA LANCE BOTTOMS IN HER INDIVIDUAL AND OFFICIAL CAPACITY AS MAYOR OF THE CITY OF ATLANTA'S MOTION TO DISMISS

COME NOW CITY OF ATLANTA, GEORGIA and KEISHA LANCE BOTTOMS, INDIVIDUALLY, AND IN HER OFFICIAL CAPACITY AS MAYOR OF ATLANTA, Defendants herein, and file and serve this Brief in Support their Motion to Dismiss, showing the Court as follows:

## I.     <u>INTRODUCTION</u>

The Summer of 2020 was historical for the most horrific reasons.   As the COVID-19 pandemic ravaged the Nation, the May 25, 2020 George Floyd murder sparked a wave of social unrest across the country unlike any other. Between 15 and 26 million people participated in some 4,600-7,750 mostly peaceful, lawful, and First Amendment-appropriate demonstrations across the country, this being the largest protest in U.S. history. (*Black Lives Matter May Be the Largest Movement in U.S. History*, The New York Times, (July 3, 2020); *Demonstrations & Political Violence in America: New Data for Summer 2020,* ACLED, Fall 2020*).*  However, not all of these demonstrations turned out to be particularly peaceful. (*Widespread unrest as curfews defied across US*, BBC News. May 31, 2020).

For example, because of violence, by early June, 2020, over 200 American cities had imposed curfews. Numerous states and Washington D.C.  activated over 96,000 National Guard, State Guard, 82nd Airborne, and 3rd Infantry Regiment service members.. (*How all 50 states are responding to the George Floyd protests, from imposing curfews to calling in the National Guard*, Business Insider, June 4,

2020). This deployment constituted the largest military operation in U.S. history. (*National Guard Press Release*. June 8, 2020). By June 4, 2020 alone at least 10,000 people had been arrested at protests. (*AP tally: Arrests at widespread US protests hit 10,000* - AP News, June 4, 2020). By November, 2020 no less than 25 deaths occurred at 2020 protests (19 in the first 14 days after Floyd's death), and vandalism related to these protests from May 28 through June 8, 2020 alone resulted in insured property loss/damage at between $1-2 billion dollars, making this wave of social unrest the most expensive in the Nation's history. (*14 Days Of Protests, 19 Dead*", Forbes, June 8, 2020; *Exclusive: $1 billion-plus riot damage is most expensive in insurance histor*y". Axios AM/PM, September 16, 2020). The Court is invited to take judicial notice of these matters and the above facts and the ones immediately below leading up to the signing of Executive Order 2020-92, at issue in this litigation, as well as Executive order 2020-92. Formally, Defendants move separately under Fed. R. Evid. 201 requesting this notice.

Plaintiffs' Complaint notes that on May 29, 2020 thousands of people gathered in downtown Atlanta to peacefully celebrate the life of George Floyd, however, beginning at noon that day the demonstration also included protesters breaking into and vandalizing the CNN Center, breaking doors and windows, ultimately inflicting major damages to dozens of other businesses, on live television. Police were pelted with foreign objects, police cars were burned, tear gas was used

by law enforcement, and one police officer was run over by an ATV. Other parts of Atlanta also saw major destruction. (*Atlanta Protests Turn Violent: Police Cars, Local Restaurants Damaged,* GPB, May 29, 2020).

At midnight on May 29, Governor Brian Kemp called up 500 National Guard members to assist the City in quelling the violence. By 5:30 p.m. on Saturday, 71 demonstration-related arrests had been made, and at least one associated killing occurred. (*Kemp Deploys National Guard As Looting, Violent Protests Continue In Atlanta*, GPB News, May 30, 2020; *UPDATE: 71 arrested during night of violent protests in Atlanta,* Atlanta Journal-Constitution, May 30, 2020). These were the dire circumstances confronting Mayor Bottoms and the 500,000 residents she serves, along with visitors, when utilizing the emergency powers at issue in this case.

## II.   FACTS[1]

In response to the escalating violence and destruction, and executing her given emergency powers, on May 30, 2020 at 5:00 p.m., Mayor Bottoms signed into law Executive Order 2020-92, a city-wide 9:00 p.m. curfew covering the entire territorial limits of the City. Pursuant to this Order, APD officers closed certain downtown

---

[1] These Defendants adopt and incorporate, as if set forth fully herein, the facts as alleged in Plaintiffs' Complaint contained on ¶¶ 2-5; 26-77; 114; and 130-42

streets and were funneling traffic away from those streets. This resulted in the stop and go heavy traffic in which Plaintiffs found themselves later that night.

At 9:39 p.m., while in this traffic, Plaintiff Young began video-recording an alleged use of force incident involving APD Sgt., Defendant Lonnie Hood. According to Plaintiffs, this prompted Defendant Officer Hood to order them out of the area, even though, because of the standstill traffic, there was nowhere to go. Plaintiffs claim some form of miscommunication that ultimately prompted the individually named Defendant officers to seize the vehicle, break the driver-side window, allegedly inappropriately fire Taser strikes upon them both, drag them from their car and eventually arrest them.

For their direct actions, four of the Defendant officers were terminated, and two were reprimanded. Plaintiffs claim that neither those six officers, nor the other three Defendant officers, were investigated for failure to intervene. In connection with their contentions the City has systemically failed to meaningfully investigate use of force incidents (both respecting use of force, and for others' failures to intervene during those incidents), Plaintiffs present a litany of past incidents, all from 2015 and before.

In setting up their *Monell* claims, Plaintiffs allege:

> The Chief of Police was the final policymaker for the City of Atlanta with final decision-making authority with regard to training and supervision of APD officers, establishing and implementing the written policies and procedures for the Atlanta Police Department ("APD"),

and managing, directing, and controlling the operations, disciplinary process, and administration of the department.

(¶ 126). The acting Chief of Police at the time of the incident was Erika Shields, who had been in that post since "the beginning of 2017."

## III.   ARGUMENT AND CITATION OF AUTHORITY

### A. Motion to Dismiss Standard

Mere conclusory allegations or bare legal conclusions are generally not sufficient to withstand a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim. See *Briehl v. General Motors Corp.*, 172 F.3d 623, 627-28 (8th Cir. 1999). In general, a motion to dismiss under 12(b)(6) asserts that even if the well pleaded material allegations of the complaint are true, such allegations are legally insufficient. Such a motion should be granted when it appears to a certainty that the plaintiff is entitled to no relief under any state of facts which can be proved in support of the claim. See *Haines v. Kerner*, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

Where a defendant challenges a complaint for failing to adequately state a claim upon which relief can be granted, the court should apply a "two-pronged approach" in analyzing the complaint. See *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). First, the court should "eliminate any allegations in the complaint that are merely legal conclusions." *Id.* This first prong excludes "threadbare recitals of a

cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663. Second, the court should assume that all well-pleaded factual allegations are true "and then determine whether [those allegations] plausibly give rise to an entitlement to relief." *Am. Dental Ass'n.*, 605 F.3d at 1290. In determining plausibility, the court should "draw on its experience and common sense." *Iqbal*, 556 U.S. at 664. Moreover, it is proper for the court to infer "'obvious alternative explanation[s]' which suggest lawful conduct rather than the unlawful conduct the plaintiff[s] would ask the court to infer." *Am. Dental Ass'n*, 605 F.3d at 1290 (*quoting Iqbal* and relying on *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

Ultimately, if the plaintiffs have not "nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* at 1289 (*quoting Twombly*, 550 U.S. at 570).

When courts choose to consider evidence outside the pleadings on Rule 12 dismissal applications, the applications are generally converted to motions for summary judgment. However, if the court deems the extrinsic evidence to be part of the pleading, such evidence may be considered without conversion. Extrinsic evidence may be considered part of a complaint when it is (1) attached to the pleading (not the case here), (2) incorporated by reference in the pleading (not the case here), or (3) the court deems the evidence integral to at least one claim in the

pleading.  See *Bank of New York Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.*, No. 11 Civ. 0505, 2011 WL 2610661, at *3 (S.D.N.Y. June 27, 2011):

> In deciding a motion to dismiss, this Court may consider the full text of documents that are quoted in or attached to the complaint, or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. "Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on the motion."

Id. (quoting, 949 F. 2d 42, 44 (2d Cir. 1991)).  See *also I.Meyer Pincus & Assocs. P.C. v. Oppenheimer & Co*., 936 F. 2d 759, 762 (2d Cir. 1991) ("[P]laintiff cannot evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach the [document] to the complaint or to incorporate it by reference.").  See also *L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419*, 422 (2d Cir. 2011)

Additionally, the Court must have power to hear a case, which is known as subject matter jurisdiction. *United States v. Cotton*, 535 U.S. 625, 630 (2002).  Subject matter jurisdiction cannot be waived by the parties and a claim for lack of subject matter jurisdiction can be raised at any time. *Id.*

In federal court, grounds for subject matter jurisdiction are contained in 28 U.S.C. §§ 1331 and 1332. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 513 (2006).  Section 1331 provides for subject matter jurisdiction over claims "arising under the Constitution, laws, or treaties of the United States," otherwise known as federal question jurisdiction.  28 U.S.C. § 1331.

"The party commencing suit in federal court . . . has the burden of establishing, by a preponderance of evidence, facts supporting the existence of federal jurisdiction." *Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1085 (11th Cir. Fla. 2010); *McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. Ala. 2002).

When a party makes a factual attack on the Court's subject matter jurisdiction, matters outside of the pleading, such as testimony and affidavits, may be considered. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (1990). Substantial authority exists that shows the Court is free to weigh the evidence and satisfy itself of the existence of its power to hear the case. *Id.* (internal quotations omitted). Therefore, the Court may consider Executive Order 2020-92.

## B. Plaintiff's Claim Against Mayor Bottoms and the City of Atlanta Based on Executive Order 2020-92 Should be Dismissed.

In Count VI of the Complaint, Plaintiffs allege 42 U.S.C. § 1983 claims against Mayor Bottoms and the City of Atlanta based on multiple different reasons pertaining to Executive Order 2020-92. The challenged Executive Order, signed pursuant to Section 2-181 of the Code of the City of Atlanta, declared an existence of an emergency and imposed a curfew of 9:00 p.m. by exercising her emergency powers.

Plaintiffs allege that Executive Order 2020-92 is improper in the following ways:

- Unconstitutionally vague and failed to provide fair notice to APD officers or citizens regarding the scope of the curfew and its provisions. (Complaint, ¶ 115).
- Unconstitutionally infringed on Plaintiffs' right to free speech and to freely travel. (Complaint, ¶ 116).
- Unconstitutionally overbroad and necessarily applied to every citizen present in the City of Atlanta, regardless of whether they were part of a large gathering of people and regardless of the likelihood that any particular citizen would incite violence or destroy property. (Complaint, ¶ 117).
- Authorized APD officers to "do any and all acts necessary and incidental to the preservation of life, limb and property of the citizenry of the city." Thus, it gave APD officers free rein to unlawfully seize and use excessive force. (Complaint, ¶¶ 118-119).

Although Plaintiffs do not challenge Mayor Bottoms' authority to implement such an executive order, this background will help illuminate the sufficiency and legality of Executive Order 2020-92. Section 2-181 of the Code of the City of Atlanta authorizes the Mayor to exercise emergency power to declare the existence of an emergency when there is, among other things: (1) an extreme likelihood of danger to life or property as a result of unusual conditions; or (2) imminent or existing civil unrest, commotion or uprising. Under the same ordinance, the Mayor may exercise certain powers, such as imposing emergency curfew regulations and to do any and all acts necessary and incidental to the preservation of life, limb and property. These powers are reiterated in Executive Order 2020-92.

Exercising police power to respond to emergency situations with temporary curfews have consistently been held proper. See, e.g., *Smith v. Avino*, 91 F3d 105, 109 (11th Cir. 1996); *Moorehead v. Farrelly*, 727 F. Supp. 193 (D. V.I. 1989);

*United States v. Chalk*, 441 F.2d 1277 (4th Cir. 1971); *In re Juan C.*, 28 Cal. App. 4th 1093 (1994). "In such circumstances, governing authorities must be granted the proper deference and wide latitude necessary for dealing with the emergency." *Avino*, 91 F.3d at 109.

Curfews such as this one, to quell rioting, violence, and loss of life and property, have been routinely upheld. See, e.g., *In re Juan C.*, 28 Cal. App. 4th 1093 (1994); *United States v. Chalk*, 441 F.2d 1277 (4th Cir. 1971); *American Civil Liberties Union v. Chandler*, 458 F. Supp. 456 (W.D. Tenn. 1978); *State v. Dobbins*, 277 N.C. 484 (1971); *Glover v. District of Columbia*, 250 A.2d 556 (D.C. Cir. 1969); *Ervin v. State*, 41 Wis. 2d 194 (1968); *State v. Boles*, 5 Conn. Cir. Ct. 22 (1967).

In *In Re Juan C.*, the California court explained the purpose of curfews in this situation:

> There is an undeniable and substantial public interest in preventing the imminent destruction of life and property. This compelling interest is promoted by the implementation of a curfew. When used as an instrument to maintain order during a civil disturbance, a curfew: protects from injury those who would otherwise enter the area unaware of the danger and disorder; protects those in the area from vigilante action; reduces pedestrian and vehicular traffic which hinders police and fire fighting mobility; prevents or reduces congregations of people which can engender mob psychology and a carnival atmosphere; reduces the number of incidents requiring police action in the curfew area; and allows the police to administer a rule which is easy to apply."

28 Cal. App. 4th at 1100.

The main case governing this issue in the Eleventh Circuit is *Smith v. Avino*, 91 F3d 105 (11th Cir. 1996)[2]. *Avino* was a § 1983 lawsuit against the county and county manager challenging a curfew that was imposed in the wake of a hurricane. *Id*. at 107. This case sets out the standard for reviewing such a curfew. "The key to judicial consideration to the challenge in this instance lies in the circumstances under which the curfew was instituted." *Id*. at 108. The relevant question is whether Mayor Bottoms' actions were taken in good faith and whether there is some factual basis for her decision that the restrictions were necessary to maintain order. *Id*.[3] at 109. Cities "must be granted the proper deference and wide latitude necessary for dealing with the emergency." *Id*.

Here, there are no allegations or facts suggesting that Mayor Bottoms acted in bad faith when imposing the curfew and signing Executive Order 2020-92. Plaintiffs do not challenge the necessity or appropriateness of the enactment of the curfew. Instead, Plaintiffs challenge the constitutionality of certain provisions. The decision by Mayor Bottoms to impose a curfew was based on her belief that the large gatherings of citizens protesting police brutality gave rise to an extreme likelihood of destruction of life or property. (Complaint, ¶ 27). Executive Order 2020-92 was

---

[2] The *Avino* court's doctrine of "hypothetical jurisdiction" was rejected and abrogated by the Supreme Court in *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1988). However, the substantive findings in *Avino* regarding curfews were not at issue in *Steel Co.* and *Avino* remains the law of the Eleventh Circuit. *7020 Entertainment, LLC v. Miami-Dade County*, 2021 WL 51682 *8 (S.D. Fla. 2021).

[3] The *Avino* decision references curfews in response to a natural disaster. *Avino*, 91 F.3d at 109. However, this has been expanded to situations where curfew is instituted in response to an emergency situation. *7020 Entertainment, LLC*, 2021 WL 51682 at *7.

signed at or around the same time as Governor Kemp entered his executive order based on civil unrest. See *Id*. Based on the facts/circumstances of this situation and the legal framework, the decision to impose a curfew and enter Executive Order 2020-92 was legal, proper and appropriate. Therefore, Defendants will address Plaintiffs' assertions regarding alleged deficiencies in Executive Order 2020-92.

### 1. Executive Order 2020-92 Was Not Unconstitutionally Vague.

Plaintiffs facially challenge Executive Order 2020-92 as being unconstitutionally vague and failing to provide fair notice to APD officers and/or citizens regarding the scope of the curfew and its prohibitions. (Complaint, ¶ 115). Specifically, Plaintiffs argue that Executive Order 2020-92 does not point out the particular locations where the curfew applies and whether citizens were allowed to travel through the City in a vehicle. "A statute is void for vagueness when its **prohibition** is so vague as to leave an individual without knowledge of the nature of the activity that is prohibited. *Id*. at 108. To be constitutional, it must give a person of reasonable intelligence a reasonable opportunity to know what is prohibited and explicitly set out standards for those who apply it in order to avoid arbitrary and discriminatory enforcement. *Id*.

In a normal situation, the proclamation, order, or statute, should be as informative as possible. *Id*. However, under emergency situations, fundamental rights may be temporarily limited or suspended. *Id*. The circumstances surrounding

these protests (or, in some cases criminal destruction of property and loss of life) required Mayor Bottoms and the City of Atlanta to act quickly. Mayor Bottoms issued an executive order that was as informative as possible, and the lack of exceptions does not render the executive order unconstitutional. *Avino*, 91 F.3d at 109. Given the circumstances, Mayor Bottoms' reaction and executive order was appropriate and Plaintiffs' claims that Executive Order 2020-92 was unconstitutionally vague should be dismissed.

### 2. Executive Order 2020-92 Did Not Unconstitutionally Infringe on Plaintiffs' Rights

In a conclusory allegation without factual support, Plaintiffs argue that "Executive Order 2020-92 unconstitutionally infringed on Plaintiffs' right to free speech and to freely travel within the city/state." (Complaint, ¶ 116). This argument lacks factual detail and is easily dismissed under applicable case law. Importantly, as demonstrated above, Plaintiffs do not challenge Mayor Bottoms' authority or the necessity to implement Executive Order 2020-92 or the curfew. "**In an emergency situation, fundamental rights such as the right of travel and free speech may be temporarily limited or suspended**." *Avino*, 91 F.3d at 109.

Plaintiffs do not explain how their right to free speech was infringed upon by Executive Order 2020-92. It is easy to understand Plaintiffs' contention regarding free travel, but the case law specifically states that the right of travel may be temporarily limited or suspended. Furthermore, as explained above, curfews such

as this one have been routinely upheld. "Rioting, looting and burning pose a similar threat to the safety and welfare of a community, and provide a compelling reason to impose a curfew. The right to travel is a hollow promise when members of the community face the possibility of being beaten or shot by an unruly mob if they attempt to exercise this right. Temporary restrictions on the right to travel at night are a reasonable means of reclaiming order from anarchy so that all might exercise their constitutional rights freely and safely." *In re Juan C.*, 28 Cal. App. 4th at 1100.

Based on the arguments above, Plaintiffs' claim that the executive order unconstitutionally infringed on their rights should be dismissed.

### 3. Executive Order 2020-92 Was Not Unconstitutionally Overbroad

Plaintiffs complain that Executive Order 2020-92 was overbroad by applying to all citizens of the City of Atlanta. (Complaint, ¶ 117). Defendants do not deny that Executive Order 2020-92 applied to all citizens present in the City of Atlanta. However, this fact does not make it unconstitutional. *Avino*, 91 F.3d at 109. ("While we agree with plaintiffs that in a normal situation, the proclamation should be as informative as possible, under the emergency circumstances present in this case, the proclamation was not constitutionally flawed because it did not include exceptions."). An executive order may be overbroad if it prohibits constitutionally protected conduct. *Graynead v. City of Rockford*, 408 U.S. 104, 114 (1972).

Plaintiffs have not otherwise alleged that Mayor Bottoms could not address the entire City in Executive Order 2020-92. Section 2-181(c) of the Code of the City of Atlanta only states that the executive order shall specify the area in which the emergency is declared to exist when the declaration is only to a portion of the city. That is not the situation here. Because Plaintiffs cannot show that Mayor Bottoms was prohibited from entering a city-wide Executive Order, this claim must fail.

### 4. Executive Order 2020-92 Did Not Authorize APD Officers to Unlawfully Seize or Use Excessive Force

Plaintiffs present a dubious argument that Executive Order 2020-92 gave ADP officers free rein to unlawfully seize and use excessive force against citizens. (Complaint, ¶ 119). According to Plaintiffs, Executive Order 2020-92 "expressly authorized APD officers to 'do <u>any and all acts</u> necessary <u>and incidental</u> to the preservation of life, limb and property of the citizenry of the city' without exception and without regard for the constitutional rights of lawful citizens" (Complaint, ¶ 118) (emphasis in original). This is patently false.

Executive Order 2020-92 does not expressly authorize APD officers to take any action or inaction. Instead, Mayor Bottoms states that she is exercising her emergency powers to take any action "necessary and incidental to the preservation of life, limb and property of the citizenry of the city." Executive Order 2020-92, Section 3. This section generally mirrors Section 2-181(b) of the Code of the City of Atlanta, which grants the mayor certain powers after declaring an emergency.

Plaintiffs' misrepresentation of the language in Executive Order 2020-92 is essential to their claim and thus it should be dismissed. Plaintiffs do not allege that Mayor Bottoms performed any unlawful seizures or used excessive force. Any alleged actions by APD officers were not "expressly authorized" by Executive Order 2020-92, as is claimed in the Complaint. Thus, APD officers did NOT have "free rein" as long as their actions were incidental to enforcing the curfew. Because the actual language of Executive Order 2020-92 directly contradicts the assertions in Plaintiffs' Complaint, Plaintiffs' claims should be dismissed.

Furthermore, this highlights that no proximate cause exists between Executive Order 2020-92 and any allegedly unlawful actions by the APD officers. There is no language in Executive Order 2020-92 authorizing the use of excessive force or unlawful seizures. Therefore, any unlawful actions by APD officers were not caused by or a result of Executive Order 2020-92. Without proving such a connection, all claims related to Executive Order 2020-92 must be dismissed.

### 5. Mayor Bottoms is Entitled to Qualified Immunity.[4]

Qualified immunity offers complete protection for a government employee sued in her individual capacity if the conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

---

[4] Claims were also brought against Mayor Bottoms in her official capacity as mayor of the City of Atlanta. Official capacity claims against municipal officers are redundant with claims against the City of Atlanta. *Kentucky v. Graham*, 473 U.S. 159 (1985). Therefore, the official-capacity claims against Mayor Bottoms should be dismissed.

*Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro,* 28 F. 3d 1188, 1194 (11th Cir. 2002). To receive qualified immunity, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Id.* "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee,* 28 F. 3d at 1194.

"Qualified immunity requires a public official to show first that he was acting within the scope of his or her discretionary authority." *Moore vs. Pederson,* 806 F.3d 1036, 1041, 1042 (11th Cir. 2015) (citing *Maddox vs. Stephens,* 727 F.3d 1109, 1120 (11th Cir. 2013)). "We have said that the term 'discretionary authority' 'includes all actions of a government official that (1) were undertaken pursuant to the performance of [her] duties, and (2) were within the scope of [her] authority.'" *Moore*, 806 F.3d at 1042 (citing *Jordan vs. Doe,* 38 F.3d 1559, 1566 (11th Cir. 1994)).

The Mayor of the City of Atlanta is given the duty of issuing executive orders and protecting the life and property of the residents of the City of Atlanta. As

previously discussed, Mayor Bottoms issued the Executive Order 2020-92 pursuant to the City of Atlanta's ordinances. Thus, she was acting within the scope of her authority. More specifically, she was acting within the scope of her discretionary authority.

"Under the doctrine of qualified immunity, government officials performing discretionary functions may not be held individually liable for civil damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *West vs. Tillman,* 496 F.3d 1321, 1326-27 (2007) (internal citations omitted).

Next, the U. S. Supreme Court has established a two-part test for the application of qualified immunity. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [a] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer,* 536 U.S. 730, 736 (2002). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiry." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). However, "[i]f a constitutional right would have been violated under the plaintiff's version of the facts, the next sequential step is to ask whether the right was clearly established." *Vinyard,* 311 F.3d at 1346.

With respect to the first prong, Plaintiffs have failed to establish a constitutional violation against Mayor Bottoms. Mayor Bottoms had the proper

authority to issue Executive Order 2020-92 and necessity required the curfew. Plaintiffs have attempted to prove constitutional violations related to Executive Order 2020-92 for the following reasons: vagueness, overbreadth, infringing on Plaintiffs' freedom of speech and freedom to travel, and improper authorization of APD officers. However, these allegations fail for the reasons explained hereinabove.

Regarding the second prong, there is no known case law establishing that Mayor Bottoms' executive order violated clearly established law under the circumstances. No case law exists showing that Executive Order 2020-92 was unconstitutional or otherwise illegal, especially when considering it responded to an emergency. Additionally, any reasonable person in Mayor Bottoms' position would not have known that issuing Executive Order 2020-92 was unlawful. Therefore, Mayor Bottoms is entitled to qualified immunity and all claims against her should be dismissed.

Alternatively, Mayor Bottoms is entitled to a different sort of qualified immunity, as set out in *Scheuer v. Rhodes*, 416 U.S. 232, 247 (1974), or a return to pre-*Harlowe* absolute immunity. The Scheuer Court provides qualified immunity to executive officers on a sliding scale, "the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which

liability is sought to be based." *Id*.  The allegations, taken as true, show that Mayor Bottoms acted in her emergency capacity to impose a curfew via executive order. This proclamation was made in an emergency setting, which was created by extreme civil unrest and violence.  There are no allegations suggesting that Mayor Bottoms acted without a "good-faith belief" and thus she should be given immunity.  *Id*. at 248.

Although *Scheuer* disregarded the then-existing common law and dismissed absolute immunity for executive officers, this sliding-scale qualified immunity acts as an absolute immunity for high-ranking executives (like Mayor Bottoms) in certain circumstances (like the emergency created by significant civil unrest). Executive officials are entitled to qualified immunity "subject to those exceptional situations where it is demonstrated that absolute immunity is essential for conduct of public businesses."   Butz v. Economou, 438 U.S. 478, 507 (1978).   The circumstances that required the issuing of Executive Order 2020-92 are the exceptional type that grants Mayor Bottoms absolute-like immunity.  To the extent this Court finds that *Harlowe* overruled *Scheurer* on this point, this constitutes a good faith effort for a change/extension of existing law, calling either for a return to absolute immunity, or a return to the *Scheurer* sliding scale form of qualified immunity.

Therefore, all claims against Mayor Bottoms should be dismissed.

21

### C. *Monell* Claims of Excessive Force Should be Dismissed

#### 1. Plaintiffs' Persistent, Pervasive, and Widespread Custom/Policy Claim Has No Merit

Plaintiffs first attempt to prove *Monell* liability is a proffer to show they have adequately pled a custom/policy case based a persistent, pervasive, and widespread custom/policy. In this, they do not have legal support.

It may be rote but § 1983 liability may not be grounded in a theory of respondeat superior. *Monell v. New York City Dep't of Social Servs*., 436 U.S. 658 (1978). That said, it is "well established that a municipality may be held liable under § 1983 . . . when the deprivation at issue was undertaken pursuant to [municipal] 'custom' or 'policy.'" *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479 (11th Cir. 1991). Municipal liability may be based on, among other things, "a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." Congruently, plaintiff may establish a policy or custom exists by showing a "persistent and wide-spread practice" and the government's actual or constructive knowledge of that practice. *Church v. City of Huntsville*, 30 F. 3d 1332, 1342–43 (11th Cir. 1994).

To prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, "although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Praprotnik v. City of St. Louis*, 485 U.S. at

112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)). In other words, a longstanding and widespread practice is deemed authorized by the final policymaking officials because they must have known about it but failed to stop it. *Brown*, *supra,* 923 F. 2d at 1481.

A municipal official who has 'final policymaking authority' in a certain area of the city's business may by his or her action subject the government to § 1983 liability when the challenged action falls within that authority." *Praprotnik,* 485 U.S. at 127); see also *Mandel v. Doe*, 888 F. 2d 783, 792–93 (11th Cir. 1989). To impose liability, Plaintiffs must show: "(1) that [their] constitutional rights were violated; (2) that the municipality had a custom . . . that constituted deliberate indifference to that constitutional right; and (3) that the . . . custom caused the violation." *McDowell v. Brown*, 392 F. 3d 1283, 1289 (11th Cir. 2004); *Brown, supra,* 923 F. 2d 1474, 1479 (11th Cir. 1991). And, of course, the offending custom or policy must be the "moving force" behind the violation. *Monell*, 436 U.S. at 694.

### a. Alleged History of Excessive Force Resulting from Failure to Conduct Meaningful Investigations

Plaintiffs claim that widespread and routine use of excessive force is the City's custom and policy resulting from its failure to conduct meaningful investigations into allegations of excessive force, and failure to investigate officers on the issue of failure to intervene. (Pls. Comp. ¶¶ 128-35). Plaintiffs criticize those investigations

for not utilizing a certain truth-finding tool, the Computer Voice Stress Analysis (CVSA) in instances where no audio or video of the force incident is available.

Plaintiffs lay all these purported shortcomings directly at the feet of the "Chief of Police" position (a collective label Plaintiffs utilize to include each Chief of the APD since 2002). Chief Erika Shields was Chief from the start of 2017 until the summer of 2020. For purposes of this Motion, Defendants concede the Chief of Police position constitutes the final policymaker for all policing and investigating matters pled in the Complaint, with the added caveat that *only* the Chief's actions relevant to this case are those of Chief Shields.

In an attempt to flesh out their pleading requirements, Plaintiffs list seven force incidents between 2003 and 2015 in which officers were allegedly not punished for their use of force actions. Reiterating, Chief Shields, the City's final policy maker on all relevant issues, did not take part in any of these decisions as she was not the Chief during that 12-year period. For each incident Plaintiffs point out shortcomings with the process and ultimate decisions. This is Plaintiffs' evidence of the "moving force" of the officers' purported wrongs. *Monell*, 436 U.S. at 694. The proffered incidents include:

> **2003- Childs** (use of force against handcuffed arrestee inside precinct)
> **2006 - Clay** (use of force against suspect)
> **2006 - Lockette** (use of force during investigatory stop)
> **2011 - Gibbs** (use of force against handcuffed man during the execution of a warrant)

> **2011 – Parks** (use of force (situation unspecified); Chief rejects Atlanta Citizen's Review Board (ACRB) recommendations
> **2014 – Cato** (use of force (situation unspecified); Chief rejects ACRB recommendations
> **2015 – Williams** (use of force situation in a hotel room)

In *Childs*, Plaintiffs take issue with the weight of the evidence, and that the investigation closed without findings regarding the use of force. Plaintiffs are dissatisfied with *Clay,* because again, there were no findings re the use of force. Albeit just covering 2 of the 7 incidents, Plaintiffs give no other background information whatsoever in these 2003 and 2006 cases that allow anyone to plausibly connect them (individually, together, or collectively with the other cases) to what happened to them on May 30, 2020.

According to Plaintiffs, in the 2006 *Lockette* case, there were two reversals of two separate findings of excessive force; ultimately finding the allegations "not sustained," and in connection with those ultimate findings, there was no investigation into any failure to intervene. Plaintiffs take issue with the lack of substance explaining the reversals and take issue with the fact that in connection with the temporary findings, there was no investigation into the failure to intervene. Again, the temporal proximity is problematic, as is just what Plaintiff is trying to use the case to stand for.

Another issue in Plaintiffs' reliance on this incident is the lack of any basis to complain that a lack of an investigation into failure to intervene should be

problematic in a matter where the ultimate findings were that the allegations of excessive force were "not sustained." It is unclear how that is probative of anything relevant to this case.

Nor do Plaintiffs cite that in Lockette, or in any other of the 7 instances alleged, there were later direct consequences for the alleged instances of inappropriate force or failure to intervene, or incomplete investigation, like say, successful lawsuits. Instead, along with this vagueness, Plaintiffs plead *Iqbal* and *Twombly*-deficient conclusions about what those incidents were, what Defendants and this Court are to take away from them, and just how these events have any part in a widespread practice of any kind. It's just conclusion after conclusion.

In *Weems,* a 2011 use of force incident, the investigation was closed with findings regarding use of force. That is all Plaintiffs say about *Weems.*

In the 2011 *Parks* case, Plaintiffs claim the APD reversed an Atlanta Citizens Review Board (ACRB) finding of excessive force, ultimately determining that the use of force there (pulling of hair) was reasonable under the circumstances. CVSA was not utilized. Plaintiffs do not make the effort to explain why the use of force was *not* reasonable (presumably taking issue with the ultimate finding), and instead complain there was no investigation into the failure to intervene. Again, the relevance of a failure to intervene investigation into a matter in which reasonable

force is found to have been utilized is unclear, and its possible further relevance to the *Monell* claims even more distant.

A quick word about the non-use of CVSA. Although Plaintiffs are clear they would prefer the City to utilize this investigatory technique, they fail to explain why their preference impacts the claims here. There is no claim that such technique is the standard by which all investigations are compared. There is no claim this is the standard around the country. There is no claim that any litigation anywhere in the country has led to findings that such "failures" that have led to Constitutional torts. Plaintiffs again fall short because the allegations are conclusory, specious, and implausible under the *Iqbal* and *Twombly* pleading standards.

The 2014 *Cato* incident involved pepper-spraying, a reversal of the ACRB recommendation of suspension, and again, no investigation into failure to intervene in a case where the ultimate findings resulted in no punishment for failure to intervene in a case where the use of force was later determined to be justified. This incident does nothing to advance Plaintiffs' cause.

Failure to use CVSA is the only misgivings Plaintiffs identify in the 2015 *Williams* matter, other than to say they disagree with the closing of the investigation without any use of force findings.

### b. Plaintiff Fails to Plead a 12(b)(6) Sufficient Allegation of Custom

Rocketing off the pages of the Complaint is the 2015 cut-off point for any purported shortcomings in the method and manner by which the City conducts investigations into allegations of excessive force. The 2015 *Williams* matter (the most recent matter) happened 5 years before this incident, 2 years before final policymaker Erika Shields became Chief of Police, and 3 years before Defendant Bottoms became Mayor.

The logic only goes one way here. Absent more timely allegations of widespread and rampant constitutionally infirm investigations of constitutionally infirm uses of force on Chief Shields's watch, the existence of a bad custom/policy simply evaporates. Everyday deductive reasoning leads to the inevitable conclusion there is a new custom in play here, the mirror opposite of the policies alleged.

Plaintiffs point directly to Chief Shields as the official policymaker governing review of an APD officer's use of force, and yet cite to not one matter of irresolute use of force investigation having occurred on her watch. More, as pled, the incidents serving as the meat and bones of Plaintiffs' custom argument fall well shy of the *Iqbal* and *Twombly* standards requiring plausibility and non-conclusory pleadings. Instead, Plaintiff vaguely point to 7 isolated incidents covering a 12-year period of time (again, 5 years before the actions complained of here, and 2 years before Shields even became Chief of Police) complaining about the outcomes of those

investigations, and the quality of the investigations leading to those outcomes. But the dots simply do not connect.

First, 5 years between the last cited investigatory outcome and the incident at issue is too remote in time to state a claim. See *Khoury v. Miami-Dade County School Board*, 2021 WL 281762 (11th Cir. July 7, 2021) (3 years between last identified evidence of custom and the date of loss to remote); *Church, supra* (1-2 years between last identified evidence of custom and the date of loss); See *Smith v. City of Moultrie*, 2007 WL 2668138 (M.D. Ga. 2007) (approximately 1.5 years between latest complaint and subject incident); *Rodriguez v. County of Westchester*, 2017 WL 118027 (S.D.N.Y. 2017) (over 6 years between the supposed notice and subject incident); *Thomas v. Westchester County*, 2013 WL 3357171 (S.D.N.Y. 2013) (less than 2 years between the supposed notice and subject incident).

Second, as mentioned throughout, Plaintiffs' tenuous descriptions of investigatory shortcomings, and how they are the moving force behind the officers use of force are vague, conclusory, and implausible. They in no way describe evidence of deliberate indifference to the rights of those involved in use of force a let alone in a situation where a citywide emergency was declared, and only one of them (as described) involve use of force in connection with a traffic encounter.

Absent much, much more, Plaintiffs' *Monell* claims of a custom of excessive force based on failure to conduct meaningful investigations fall well short of the mark and are ripe for dismissal.

**D. Plaintiffs' § 1983 Failure to Train and/or Supervise Claim Must Fail.**

Plaintiffs allege that the City of Atlanta's failure "to investigate, reprimand, discipline, train, and/or supervise" police officers regarding the duty to intervene "amounts to a municipal policy of deliberate indifference which was the moving force behind Defendants' use of excessive force against Plaintiffs." (Complaint, ¶ 154).

The failure to train or supervise creates liability only in limited circumstances, where there is inadequate training or supervising of the employees, this failure to train or supervise is a policy, and the policy causes the violation of a citizen's constitutional rights. *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *City of Canton v. Harris*, 389 U.S. 378, 387-91 (1989)).

Since cities rarely have an express policy of inadequately training or supervising its employees, a plaintiff may prove a failure by showing a "deliberate indifference" to the rights of the citizens. *Gold*, 151 F.3d at 1350. "Deliberate indifference can be established in two ways: by showing a widespread pattern of similar constitutional violations by untrained employees or by showing that the need for training was so obvious that a municipality's failure to train its employees would

result in a constitutional violation." *Mingo v. City of Mobile, Ala.*, 592 Fed. Appx. 793, 799-800 (11th Cir. 2014). Plaintiffs "must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Id.* Without notice of a necessity to train or supervise, a municipality is not liable as a matter of law. Id. at 1351. Additionally, when relying on past complaints, a plaintiff must demonstrate that the complaints had merit. *Id.*

In support of their claim that occurred in 2020, Plaintiffs rely on 8 alleged incidences occurring in 2002, 2009, 2011, 2011, 2013, 2014, 2015 and 2015. (Complaint, ¶ 142). Plaintiffs state that these are examples, but Plaintiffs are required to provide specific incidences that would give the City of Atlanta knowledge of a need to train and/or supervise. See *O'Kelley v. Craig*, 781 Fed. Appx. 888, 899 (2019) (affirming the dismissal of failure-to-train claim because plaintiff failed to offer "any specifics of current training or whether the Sheriff was aware of any similar prior incidents"). Thus, these examples must support Plaintiffs' allegations of failure to train and/or supervise. For multiple reasons, these allegations are insufficient to provide a basis for failure to train/supervise liability. Many of Defendants' arguments are similar to or the same as the arguments raised in response to Plaintiffs' *Monell* claims above.

First, Chief Shields did not take part in any of the aforementioned incidents as she was not the Chief during that time period. The latest incident referenced, in 2015, occurred 5 years before the subject event, 2 years before final policymaker Erika Shields became Chief of Police, and 3 years before Mayor Bottoms became the mayor. These incidents spanning a 12-year period of time, well before the event at issue in this lawsuit, is insufficient to survive dismissal. Based on these allegations, it cannot be said that Chief Shields or the City of Atlanta had knowledge of a widespread failure to intervene. See, e.g., *Reese v. Herbert*, 2006 WL 1892026 (N.D. Ga. 2006) (rev'd in part on other grounds). Defendants reincorporate and reiterate the specific arguments discussed above in response to these incidences as if fully set forth herein.

Importantly, Plaintiffs allege nothing to show that these incidents have "merit." Even if there were a large number of relevant complaints, the failure to show or even allege that the past complaints had merit or validity is fatal to their claim. *Gold*, 151 F.3d at 1351. The Eleventh Circuit held that a City lacked notice when there were ten citizen complaints about the specific issue, but the plaintiff did not establish that the complaints had merit. *Brooks v. Scheib*, 813 F.2d 1191 (11th Cir. 1987).

Although Plaintiffs argue that the failure to investigate, reprimand, discipline, train, and/or supervise was the "moving force" behind the use of excessive force, the

Complaint fails to contain any allegations that better investigating, reprimanding, disciplining, training, and/or supervising would have prevented Plaintiffs' injuries. *Brooks*, 813 F.2d at 1195. Therefore, the causal connection, which is a critical element to Plaintiffs' claim, is absent and Plaintiff's claim for failure to train and/or supervise should be dismissed. *Harris*, 389 U.S. at 387-91.

For all these reasons, Plaintiffs' claim for failure to train and/or supervise should be dismissed.

### E. <u>Plaintiffs' Claim for Punitive Damages Must Fail.</u>

Plaintiffs allege that they are entitled to punitive damages because Defendants acted with malice and/or reckless indifference. This claim should be dismissed as Plaintiffs' substantive claims fail. However, even if Plaintiffs' substantive claims are not dismissed, the punitive damage claims against these Defendants should be dismissed because there are no allegations or facts that show that these Defendants acted with willful misconduct, malice, fraud, wantonness, oppression or an entire want of care.

### <u>CONCLUSION</u>

As explained hereinabove, all claims against the City of Atlanta or Mayor Bottoms should be dismissed. Plaintiffs have failed to show that unconstitutionality of Executive Order 2020-92. More, Defendant Bottoms in her individual capacity is entitled to qualified, sliding scale qualified or absolute immunity regarding

execution of the Executive Order. Likewise, Plaintiffs have not met their pleading burden and their *Monell* claims should not survive the dismissal stage. Lastly, Plaintiffs' failure to train and/or supervise claim fails in many of the same ways their *Monell* claims fail. Therefore, the City of Atlanta and Mayor Bottoms should be dismissed from this lawsuit.

Respectfully submitted this 12th day of August, 2021.

**HALL BOOTH SMITH, P.C.**
*/s/ R. David Ware*
*/s/ Phillip E. Friduss*

191 Peachtree Street. N.E.          R. DAVID WARE
Suite 2900                          Georgia Bar No. 737756
Atlanta, Georgia 30303              PHILLIP E. FRIDUSS
Tel:   (404) 954-5000               Georgia Bar No. 277220
Fax:  (404) 954-5020                RUSSELL A. BRITT
Email: dware@hallboothsmith.com     Georgia Bar No. 473664
        pfriduss@hallboothsmith.com
        rbritt@hallboothsmith.com   *Counsel for Defendant City of Atlanta,*
                                    *Georgia and Keisha Lance Bottoms*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

TANIYAH PILGRIM AND
MESSIAH YOUNG,

     Plaintiffs,

v.

CITY OF ATLANTA, GEORGIA;
KEISHA LANCE BOTTOMS, in
her individual and official capacity
as the Mayor of the City of Atlanta;
LONNIE HOOD, in his individual
and supervisory capacity; MARK
GARDNER, in his individual
capacity; IVORY STREETER, in
his individual capacity; ARMON
JONES, in his individual capacity;
WILLIE T. SAULS, JR., in his
individual capacity; ROLAND
CLAUD, in his individual capacity,
CARLOS SMITH, in his individual
capacity; STEVEN MCKESEY, in
his individual capacity; SHELDON
DRINKARD, in his individual
capacity; and JOHN DOE
OFFICERS 1-10, in their respective
individual and/or supervisory
capacities,

     Defendants.

CIVIL ACTION
FILE NO. 1:21-cv-02472-TWT

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy **BRIEF IN SUPPORT OF DEFENDANTS CITY OF ATLANTA, GEORGIA AND KEISHA LANCE BOTTOMS IN HER INDIVIDUAL AND OFFICIAL CAPACITY AS MAYOR OF THE CITY OF ATLANTA'S MOTION TO DISMISS** electronically with the Clerk of Court using the CM/ECF system, which will send an electronic notification of such filing to the following:

Larry Christopher Stewart, Esq.
Stewart Miller Simmons
55 Ivan Allen Jr. Blvd., NW
Suite 700
Atlanta, Georgia  30308
cstewart@stewarttrial.com

Thomas E. Mitchell
Carothers & Mitchell, LLC
1809 Buford Highway
Buford, Georgia 30518
thomas.mitchell@carmitch.com

Mawuli Melvyn Malcolm Davis, Esq.
Harold W. Spence, Esq.
Davis Bozeman Law Firm, PC
4153-C Flat Shoals Parkway, Ste. 332
Decatur, Georgia  30034
mdavis@davisbozemanlaw.com
hspence@davisbozemanlaw.com

This 12th day of August, 2021.

191 Peachtree Street. N.E.
Suite 2900
Atlanta, Georgia 30303
Tel:     (404) 954-5000
Fax:   (404) 954-5020
Email: dware@hallboothsmith.com
         pfriduss@hallboothsmith.com
         rbritt@hallboothsmith.com

**HALL BOOTH SMITH, P.C.**
*/s/ R. David Ware*
*/s/ Phillip E. Friduss*
R. DAVID WARE
Georgia Bar No. 737756
PHILLIP E. FRIDUSS
Georgia Bar No. 277220
RUSSELL A. BRITT
Georgia Bar No. 473664

*Counsel for Defendant City of Atlanta,*
*Georgia and Keisha Lance Bottoms*